THIS OPINION HAS NO PRECEDENTIAL VALUE

THIS OPINION
 HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN
 ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 South Carolina
 Department of Social Services, Respondent,
   v.
 Laquitta S. and
 Anthony S., Defendants, 
 of whom is
 Laquitta S. is Appellant.
 In the Interest
 of: L. R. S. (DOB: 03/03/04); a minor child under the age of 18.
 
 
 

Appeal From Horry County
 Wylie H. Caldwell, Jr., Family Court
 Judge
Unpublished Opinion No.  2007-UP-537
Submitted November 1, 2007  Filed
 November 29, 2007
AFFIRMED

 
 
 
 Ronald R. Norton, of Conway, for Appellant.
 Robert Paul Taylor, of Conway, for Respondent.
 Paige F. Bellamy, of Myrtle Beach, for Childs Guardian ad Litem.
 
 
 

PER CURIAM: The
 South Carolina Department of Social Services (DSS) brought this termination of
 parental rights (TPR) action against Laquitta S. (Mother) and Anthony S.
 (Father).  The family court terminated Mothers and Fathers parental rights to
 L. R. S. (Child).[1]  Mother appeals the family courts termination of her parental rights.  We
 affirm.[2]   
FACTS
Mother gave birth to Child on March 30, 2004.  Three days later,
 DSS took Child into emergency protective custody directly from the hospital
 because of its concern Mother would be unable to care for Child at home.  DSS
 case manager, Felicia Bellamy, testified at the TPR hearing that Mother, who is
 HIV positive and has an IQ of 60, did not understand that her plans to
 breastfeed could potentially endanger Childs health.   
DSS prepared a treatment plan requiring
 Mother and Father to undergo psychological evaluations, attend parenting
 classes, and maintain appropriate housing.  On
 September 23, 2004, the court ordered DSS to make arrangements to transport
 Child from the foster home to Mothers home for daily supervised visits, Monday
 through Friday; the visits were to last at least two hours per day.  DSS
 contracted with the Youth Advocacy Program to transport Child and supervise the
 daily visits. 
For approximately three months, Kathleen Chapman of the Youth
 Advocacy Program transported Child from foster care to Mothers home for daily
 visits.  During these visits, Chapman supervised the interaction between Mother
 and Child and assisted Mother with the care of Child.  Chapman testified that
 each visit to Mothers home lasted approximately six hours.  
Following a Merits Hearing on December 9-10, 2004, the court
 relieved DSS of transporting Child to Mothers home for daily visits; instead,
 the court ordered DSS to exercise its own discretion over future visits.  After
 the termination of court-ordered visits, Mother visited Child only twice from
 January 2005 to July 2006.  The first visit, on April 2, 2005, took place at a
 fast food restaurant and was supervised by Childs foster parent.  Following
 this visit, the foster parent reported that she did not want to supervise
 future visits due to Mothers inappropriate comments in Childs presence. 
 Mother did not visit Child again until December 9, 2005.  
 Bellamy testified Mother contacted DSS in February 2006, to
 schedule a visit.  Based on DSS notes regarding Mothers two visits in 2005,
 DSS staff was reluctant to schedule additional visits.  However, in response to
 Mothers continuing attempts to schedule a visit, Bellamy visited Mothers home
 on April 7, 2006.  During the visit, Mother said she was living with
 Kevin Harrell and told Ms. Bellamy she planned to sign over Child to Kevins
 mother for adoption once Child was returned to her.[3]  
Thereafter,
 DSS filed an action to terminate Mothers parental rights.  The family court
 found termination of Mothers parental rights was in the best interest of Child
 and was supported by the following statutory grounds: Child lived outside
 Mothers home for six months, and Mother had provided no meaningful support or
 material contributions to Child during that period, pursuant to S.C. Code Ann.
 § 20-7-1572(4); Child lived outside Mothers home for six months, and Mother
 had willfully failed to visit Child after December 2005, pursuant to S.C. Code
 Ann. § 20-7-1572(3); Mother failed to remedy the conditions which caused
 removal of Child, pursuant to S.C. Code Ann. § 20-7-1572(2); and Child had been
 in foster care for fifteen of the most recent twenty-two months, pursuant to
 S.C. Code Ann. § 20-7-1572(8).  This appeal followed. 
STANDARD OF REVIEW
The grounds for
 the TPR must be proven by clear and convincing evidence. S.C. Dept of Soc.
 Servs. v. Parker, 336 S.C. 248, 254, 519 S.E.2d 351, 354 (Ct. App. 1999). 
 Upon review, the appellate court may make its own finding from the record as
 to whether clear and convincing evidence supports the termination [of parental
 rights].  S.C. Dept of Soc. Servs. v. Headden, 354 S.C. 602, 609, 582
 S.E.2d 419, 423 (2003).  Despite our broad scope of review, we are not required
 to disregard the findings of the family court because the family court, who
 saw and heard the witnesses, was in a better position to evaluate their credibility
 and assign comparative weight to their testimony. Id.
LAW/ANALYSIS
Although
 Child left the hospital in DSS care following birth and continuously remained
 in DSS care for twenty-seven months, Mother argues the family court erred in
 terminating her parental rights and brings four issues for our review: (1) DSS
 failed to show by clear and convincing evidence that Mother had failed to
 remedy the conditions that caused removal; (2) Mothers failure to visit Child
 was not willful because DSS prevented visits between Mother and Child following
 termination of DSS-coordinated visits in December 2004; (3) Mothers failure to
 support Child for six months was not willful; and (4) no testimony supported a
 finding of severe and repeated abuse or neglect that was unlikely to be
 remedied within twelve months.  We find that clear and convincing evidence
 supports at least one ground for termination and that termination is in Childs
 best interest. 
In South Carolina, procedures for TPR are governed by statute.  See S.C. Code Ann. §§
 20-7-1560 to 1582 (Supp. 2006).   The purpose of the TPR statute is:

 to
 establish procedures for the reasonable and compassionate termination of
 parental rights where children are abused, neglected, or abandoned in order to
 protect the health and welfare of these children and make them eligible for
 adoption by persons who will provide a suitable home environment and the love
 and care necessary for a happy, healthful, and productive life.

S.C. Code Ann. § 20-7-1560
 (Supp. 2006).  The TPR statute must be liberally construed in order to ensure
 prompt judicial procedures for freeing minor children from the custody and
 control of their parents by terminating the parent-child relationship.  The
 interests of the child shall prevail if the childs interest and the parental
 rights conflict.  S.C. Code Ann. § 20-7-1578 (Supp. 2006).  The family court
 may order TPR upon a finding of one or more of the eleven statutory grounds and
 a finding that termination is in the best interest of the child.  See S.C.
 Code Ann. § 20-7-1572 (Supp. 2006).   
In
 this case, the record demonstrates Child had been in foster care since birth,
 and was twenty-seven months old and still residing in foster care when the TPR
 hearing was conducted.  A finding that Child had been in foster care for
 fifteen months is sufficient to support TPR where the court also finds TPR is
 in the best interest of Child.  S.C. Dept of Soc. Servs. v. Sims, 359
 S.C. 601, 606, 598 S.E.2d 303, 306 (Ct. App. 2004).  The fact that DSS proved
 by clear and convincing evidence that Child had been in foster care for the
 past twenty-seven months is not disputed by Mother.
Because
 we affirm the family courts finding that Child has resided in foster care for
 fifteen of the past twenty-two months satisfies the statutory ground for TPR,
 we decline to address additional statutory grounds for termination of Mothers
 parental rights.  Accordingly, the family court did not err in terminating
 Mothers parental rights based on its finding that a statutory ground was
 satisfied.  See S.C. Code Ann. § 20-7-1572(8).
Mother also does not challenge the family courts
 finding that termination of her parental rights is in the best interest of
 Child.  We address this issue nonetheless due to the courts role in protecting
 minors.  See, e.g., Arscott v. Bacon, 351 S.C. 44, 55, 567
 S.E.2d 898, 904 (Ct. App. 2002) ([D]ue to the role of courts in protecting
 minors, this court may raise ex mero motu issues not raised by
 the parties.).  In a TPR case, the best interest of the child is the paramount
 consideration.  Doe v. Baby Boy Roe, 353 S.C. 576, 579, 578 S.E.2d 733,
 735 (Ct. App. 2003).  The interests of the child shall prevail if the childs
 interest and the parental rights conflict.  S.C. Code Ann. § 20-7-1578 (Supp.
 2006).
Mothers
 guardian ad litem, Glenn Ohanesian, testified: [t]his woman would do anything
 within her power to care for this child, and she has to the best of her ability
 complied with anything shes been asked to do . . . .  I think that based on
 what weve heard, the testimony is already in the record that with constant
 supervision and . . . the right facility that she could stay with this child .
 . . .  
Bellamy
 testified that DSS coordinated supervised visits in Mothers home for three
 months.  The visits lasted approximately six hours a day and were designed to
 help Mother learn to care for her child.  DSS also explored the possibility of
 placing Mother and Child in a group home or therapeutic foster home that would
 provide services to both of them.  However, Bellamy testified that these homes
 indicated they could not take a mentally limited mother and her baby.        
 
DSS
 referred Mother to parenting classes coordinated by Family Outreach.  Sherry
 Coutain, Director of Education and an LPN, testified Mother attended eight
 hours of infant care instruction in June 2004.  Child did not attend the
 parenting classes; instead, Mother practiced infant care skills with a demo
 doll.  Coutain testified that although she believed Mother wanted to be a good
 mother, I would not recommend that the child be left in her care without
 supervision . . . .  When asked how much supervision Mother would need to
 adequately care for her child, Coutain responded: I would say she would need .
 . . constant supervision. 
From
 September 27 to December 9, 2004, Kathleen Chapman of the Youth Advocacy
 Program transported Child from the foster home to Mothers home and supervised
 their daily visits.  She testified that Mothers home was dirty and without
 soap, dish detergent, or toilet paper.  In addition to supervising the
 interactions between Mother and Child, Chapman assisted Mother in making infant
 formula and helped her operate the nebulizer and suctioning syringe required to
 treat Childs asthma.  
Chapman
 testified that people would come and go from Mothers home throughout the
 supervised visits, sometimes taking food and baby formula.  According to
 Chapman, [Mother] was taken advantage of greatly, greatly.  Chapman also
 testified Mother did not understand the severity of her HIV condition and told
 her she let people have sex for money. 
Mother
 testified she no longer lived at the home where Child had visited with her in
 2004.  Since then, she had lived with her aunt for a while and, for the past
 two days, had been living with her roommate, Cal.  When the court asked Mother
 what she would do if she and Cal had a falling out, she responded: Ill go
 back to the mission to stay until I find me another place.  
Following
 the completion of testimony, the court noted: [t]wo years is a long time for a
 parent not to get in a position to, at the very minimum, have a decent home for
 her to go to . . . .  [T]his child has been out of the parents home ever since
 she was removed in March of 2004, and they still dont have anywhere for her to
 live . . . .  We agree and find that termination of Mothers parental rights
 is in Childs best interest. 
                                                CONCLUSION
Based on the
 foregoing, the family courts order is 
AFFIRMED.
HUFF
 and PIEPER, JJ., and GOOLSBY, A.J., concur.  

[1 Father and Mother were
 living at the same address at the time of Childs birth; however, Fathers
 paternity was not confirmed until he took a paternity test on September 15,
 2004.  Father no longer lives with Mother
 and was served by publication.  He did not attend the TPR hearing; however, his
 interests were represented by counsel, James Young, and guardian ad litem, John
 Thomas.  Neither Mr. Young nor Mr. Thomas had been able to locate Father.  The
 last documented contact between DSS and Father occurred in December 2004.
 
[2] We decide this case without oral argument
 pursuant to Rule 215, SCACR.
[3] There is no further mention of Kevin Harrells
 mother in the Record.